# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DANTE' STUCKEY,

    Plaintiff,

    v.

NP YVETTE LEDJO, et al.,

    Defendants.

Civil Action No.:  SAG-21-3203

## MEMORANDUM OPINION

Self-represented Plaintiff Dante' Stuckey filed his Amended Complaint in this civil rights action against NP Yvette Ledjo, NP, Munjanja Litell, Dr. Tewodros Teferra, NP Ruth Kingoo, Dr. Abdulzahed Jahed, Dr. Jerry Ann Hunter, Dr. Contah Nimely, Dr. Mahboobeh Memarsadeghi, Chantal Tchoumba, and Corizon Health, Inc. on February 3, 2022.  Am. Compl., ECF No. 8. Defendants Teferra, Kingoo, Hunter, Memarsadeghi, and Corizon Health, Inc. (collectively the "Corizon Defendants") filed a Motion to Dismiss or, Alternatively, for Summary Judgment on May 4, 2022.  ECF No. 26.  Defendants Ledjo, Litell, and Nimely (collectively the "Wexford Defendants") filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on June 9, 2022.  ECF No. 29.  Defendant Jahed filed a Motion to Dismiss Plaintiff's Amended Complaint on October 14, 2022.  ECF No. 42.  To date, Stuckey has not filed a response to any of the pending motions.[1]  A hearing is not necessary to resolve the motions.  *See* Local Rule 105.6 (D. Md. 2021).  For the following reasons, the Court will grant Defendants' motions except as to

---

[1] On July 6, 2022, Stuckey was granted an extension of time to respond to the Corizon Defendants' Motion to and including July 25, 2022.  ECF No. 32. Stuckey was thereafter granted additional extensions of time to respond to Defendants' Motions on August 17, October 19, and December 22, 2022.  ECF Nos. 35, 45, 48.  The final extension was granted to and including January 20, 2023.  ECF No. 48.

Corizon Health, Inc. due to the stay imposed pursuant to their bankruptcy proceedings (*see* ECF No. 52).

## Background

Stuckey is a male inmate with a pre-incarceration medical history of osteoarthritis, also known as degenerative joint disease ("DJD"), with related chronic musculoskeletal and joint pain in his hips, back, and knees. ECF No. 29-5 at ¶ 4 (Nimely Decl.). DJD is the most common type of arthritis; its contributing factors include genetics, obesity, joint overuse, aging, injury, and trauma. *Id.* at ¶ 5. Symptoms include pain, stiffness, muscle weakness, swelling, cracking or creaking of joints, and a reduced range of motion. *Id.* Treatment generally begins with conservative care including medications, bone supplements, lifestyle changes, therapeutic exercises, and use of orthotic or ambulatory aids. *Id.* Surgical intervention may be explored if conservative treatments fail. *Id.*

Upon initial intake on March 11, 2017, Stuckey reported chronic right hip pain; he was prescribed 500mg Naproxen. ECF No. 29-4 at 1-2.[2] He was assigned to Patuxent Institution where his hip pain was monitored until he was transferred to Maryland Correctional Training Center ("MCTC") on December 19, 2017. *Id.* at 3-11.

RN Christina Gibson saw Stuckey on December 31, 2017, upon his complaint that he had yet to receive his Naproxen since his transfer to MCTC. ECF No. 29-4 at 14, 87. Gibson gave him ibuprofen and referred him to a provider for further evaluation. *Id.* at 14. On February 7, 2018, Stuckey saw NP Ledjo for his provider visit; after examination she renewed his Naproxen and ordered glucosamine chondroitin, a bone supplement. *Id.* at 16-17; ECF No. 29-6 at ¶ 5 (Ledjo Decl.). She also ordered an x-ray of his hips to determine the cause of his pain; the x-ray was

---

[2] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case File (CM/ECF) system.

taken the next day.  ECF No. 8-1 at 3-4; ECF No. 26-7 at 4, 6.  On February 26, 2018, NP Litell

saw Stuckey for a follow up to read the x-ray results, which showed severe degeneration of his

right hip and mild degeneration of his left hip.  ECF No. 8 at 5; *see* ECF No. 8-1 at 5-10.  Stuckey

reported that outside medical providers had advised him to wait as long as possible to get surgery,

so he was not requesting it at that time.  ECF No. 29-4 at 18.  Litell provided him with hip exercises,

which Stuckey was instructed to do in combination with his medications.  *Id.*  Stuckey asserts that

both Ledjo and Litell refused to modify his Special Needs Order (SNO) in response to the results.[3]

ECF No. 8 at 5.  Both Ledjo and Litell deny that Stuckey requested a modified SNO during their

respective visits.  ECF No. 29-6 at ¶ 6; ECF No. 29-7 at ¶ 6 (Litell Decl.).

Stuckey states that on July 4, 2018, he was referred to Dr. Nimely for a refill of his pain

medications, Naproxen and Glucosamine, but she refused to modify his SNO in light of the recent

x-ray results.  ECF No. 8 at 6; *see* ECF No. 8-1 at 11.  Dr. Nimely attests that on that date, Stuckey

was actually seen by RN Dianne M. Cullen for a sick call complaint regarding a cyst on his back

and a request for refills of his hip pain medication.  ECF No. 29-5 at ¶ 6; *see* ECF No. 29-4 at 20-

22.  He was instructed to purchase ibuprofen from the dispensary until he could be seen by a

provider.  *Id.*  His medications were refilled on July 23, 2018, by NP Litell and on December 18,

2018, by NP Ledjo.  ECF No. 8-1 at 12-14.

Corizon became the contracted medical provider for Maryland prisons on January 1, 2019.

ECF No. 26-3 at ¶ 6 (Memarsadeghi Decl.).

Stuckey was provided with more pain medication by Defendant Tchoumba on August 18,

2019, who also enrolled Stuckey in chronic care for pain management.  ECF No. 8-1 at 19-20.  She

noted that Stuckey had chronic joint pain due to arthritis and educated him on routine stretching

---

[3] The Amended Complaint does not describe the contents of Stuckey's SNO or why it needed to be modified.

exercises.  ECF No. 26-7 at 39.  Stuckey claims his SNO was not modified at this time either.  ECF

No. 8 at 6.

On November 19, 2019, during Stuckey's first chronic care appointment, Stuckey reported

he had experienced hip pain for a couple of years, was taking glucosamine, and wanted to switch

from Naproxen to ibuprofen.  ECF No. 26-3 at ¶ 8.  Dr. Memarsadeghi confirmed Stuckey had

severe DJD in his right hip and mild DJD in his left hip.  ECF No. 8-1 at 21-22.  A physical

examination revealed weak hip muscles and mild to moderate pain with motion.  ECF No. 26-7 at

43-44.  He states he was given more pain medication, but his SNO was not modified at this

appointment.  ECF No. 8 at 6.  Dr. Memarsadeghi denies that Stuckey requested any modification

to his SNO during the visit, or even that he already had one in place.  ECF No. 26-3 at ¶¶ 8, 14.

This was Dr. Memarsadeghi's only appointment with Stuckey.  *Id.* at ¶ 8.

Stuckey began submitting sick calls requesting to see an orthopedic doctor in December

2020 and complaining that his medications were no longer effective beginning in June 2021.  *See*

ECF No. 26-8 at 83-84, 87, 89; ECF No. 26-9 at 1, 10, 12, 14, 16.

Stuckey saw Dr. Nimely on February 19, 2020, at which time he reported chronic pain in

both his knees and hips.  ECF No. 8-1 at 23-24.  Dr. Nimely noted that a hip replacement had been

considered as an option for his right hip, but Stuckey wanted to defer the procedure as long as

possible.  *Id.*  Stuckey was experiencing intermittent limping "with pain exacerbation."  *Id.*  His

medications were continued and he was advised to adhere to his exercise program to preserve

function.  ECF No. 29-4 at 36-37.  Dr. Nimely denies that Stuckey raised a need for a SNO related

to his condition.  ECF No. 29-5 at ¶ 7.  Dr. Nimely saw him again on March 26 and April 16, 2020,

for Kenalog injections for his knees; Stuckey did not request an SNO during either of these visits

either.  *Id.* at ¶¶ 8-9; ECF No. 29-4 at 38-40.

Stuckey was not seen in May or August 2020 due to COVID-19 safety protocol, but his prescriptions were renewed.  ECF No. 29-4 at 43-44.  Stuckey was transferred to Maryland Correctional Institution – Hagerstown on November 2, 2020.  *Id.* at 45.

Dr. Teferra saw Stuckey on March 1, 2021.  ECF No. 8 at 6.  Stuckey reported intermittent swelling in his left knee and he was limping on his right side due to hip pain.  ECF No. 26-4 at ¶ 5 (Teferra Decl.).  Dr. Teferra submitted a request for Stuckey to be evaluated by an orthopedic specialist to consider surgery, but did not modify his SNO.  *Id.*; ECF No. 8-1 at 32.  She also ordered Stuckey a cane.  ECF No. 26-4 at ¶ 5.  Dr. Teferra denies that he requested any SNO or that one was in place during this visit, which was her only visit with Stuckey.  *Id.* at ¶¶ 5, 8.

Approval for specialist visits are determined by Utilization Management ("UM").  ECF No. 26-4 at ¶ 6.  Upon receipt of a request, UM either approves the treatment or provides an alternative treatment plan ("ATP") based on its finding of whether there is sufficient evidence to find the request is medically necessary.  *Id.*

UM received Dr. Teferra's request on March 3, 2021, and returned an ATP recommending conservative therapy because Stuckey's pain was controlled, had been consistent for years, and a cane had been ordered.  ECF No. 26-11 at 24-28. NP Kingoo submitted another request for evaluation by an orthopedic specialist on May 3, 2021, but, according to Stuckey, still refused to modify his SNO.  ECF No. 8 at 7; ECF No. 8-1 at 36.  NP Kingoo denies that Stuckey requested an SNO during this visit.  ECF No. 26-5 at ¶ 5 (Kingoo Decl.).  UM again returned an ATP, finding that the consult was not medically necessary and recommending an exercise program, weight loss, and non-narcotic pain therapy.  ECF No. 26-11 at 29-33.

Dr. Jahed, NP Kingoo, and Dr. Hunter also requested orthopedic consults on June 3, August 23, and September 15, 2021, respectively.  ECF No. 8 at 7; ECF No. 8-1 at 38, 41, 45.  Each was

returned with an ATP.  The first suggested examination of the affected body parts and trialed therapies were necessary to determine necessity.  ECF No. 26-11 at 34-36.  The second recommended adding duloxetine, weight loss, home exercise, and an assistive device.  *Id.* at 37-39.  The third recommended maximizing oral medical treatment, weight loss, and home exercise.  *Id.* at 40-47.

In addition to the orthopedic consult request, Dr. Jahed also ordered hip radiographs during an appointment on June 3, 2021.  ECF No. 8-1 at 40; *see* ECF No. 42-1 at 13.  Stuckey asserts that Dr. Jahed refused to modify the SNO during this visit.  ECF No. 8 at 7.

During NP Kingoo's visit on August 23, 2021, Stuckey reported that his current medications were not working.  ECF No. 26-8 at 25-26.  Stuckey's recent x-rays showed advanced DJD in his right hip and mild to moderate DJD in his left hip.  *Id.*  Stuckey's glucosamine was increased to two caps twice daily, his ibuprofen increased to three times daily, and he was provided Salonpas pain relief patches and muscle rub.  *Id.*  Kingoo denies that Stuckey requested an SNO during this visit, nor did he have one to modify.  ECF No. 26-5 at ¶ 9.

Dr. Hunter saw Stuckey for a chronic care appointment on September 15, 2021, for hip pain related to his DJD.  ECF No. 26-6 at ¶ 5 (Hunter Decl.).  Dr. Hunter noted Stuckey's DJD had been gradually increasing in severity.  ECF No. 26-8 at 32-33.  Stuckey reported that his pain had been under control but walking and standing were more difficult despite complying with exercises and medications.  *Id.*  Dr. Hunter renewed Stuckey's prescriptions and added a muscle relaxer, Baclofen.  ECF No. 26-6 at ¶ 5.  Hunter denies Stuckey had an SNO or that he requested any modification to an SNO.  *Id.* at ¶ 8.

Stuckey asserts that , as a result of the delay in receiving surgery, he developed a deep bone infection and relies on a cane for mobility.  ECF No. 8 at 8.  An infection of the bone, also known

as osteomyelitis, usually presents with symptoms of fever, chills, erythema, irritability, swelling, and pain. ECF No. 29-5 at ¶ 11. Dr. Nimely attests that Stuckey did not present to her with any of the clinical symptoms of a bone infection. *Id.* He also contends that the delay in receiving an orthopedic consult was due to Corizon's "cost-reduction policies." ECF No. 8 at 8. Stuckey seeks monetary damages as relief. *Id.* at 9.

## Legal Standards

### I.       Federal Rules of Civil Procedure 12(b)(6) and 56(a)

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

The Corizon and Wexford Defendants' Motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because the Corizon and Wexford Defendants filed motions styled as motions to dismiss, or in the alternative, for summary judgment, Stuckey was on notice that the Court could treat the Motions as ones for summary judgment and rule on that basis.

## II.     Eighth Amendment

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or to ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate

with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

If the required subjective knowledge is established, a defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016) ("[A] prison official's response to a known threat to inmate safety must be reasonable."). Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)) *see also Jackson*, 775 F.3d at 179 (physician's act of prescribing treatment raises fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice,

the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (transgender inmate stated plausible claim in alleging defendant's refusal to evaluate her for gender reassignment surgery where current therapy failed to alleviate urge for serious self-harm).

**Discussion**

### I.    Dr. Jahed

Dr. Jahed argues that he is entitled to dismissal because the Amended Complaint falls short of stating a claim for deliberate indifference.  ECF No. 42-1 at 13.  Stuckey's allegations against Dr. Jahed concern a single appointment on June 3, 2021, during which Dr. Jahed requested an orthopedic consult and ordered hip radiographs.  *See* ECF No. 8-1 at 38-40.  Stuckey claims that Dr. Jahed failed to modify his SNO during that appointment.  ECF No. 8 at 7.

Stuckey's Amended Complaint fails to establish the necessary elements to state an Eighth Amendment claim for deliberate indifference as to his hip pain or the SNO.  Assuming Stuckey's hip pain is an objectively serious medical need, Stuckey fails to allege that Dr. Jahed was subjectively reckless in the actions he took.  Based on the records provided by Stuckey, Dr. Jahed renewed his pain medications and requested a consultation with an orthopedic specialist to address Stuckey's persistent pain.  Additionally, Stuckey does not allege that Dr. Jahed was subjectively aware of any existing SNO to modify.  As such, Dr. Jahed's Motion to Dismiss is granted.

### II.    Wexford Defendants

The Wexford Defendants assert they are entitled to dismissal of the Amended Complaint pursuant to Federal Rule 12(b)(6) or, in the alternative, to summary judgment pursuant to Federal Rule 56 because Stuckey's allegations are time barred and fail to demonstrate a claim for deliberate indifference under the Eighth Amendment.  ECF No. 29-3.

a.   Statute of Limitations

The statute of limitations is an affirmative defense that must be raised by a defendant, who

also has the burden of establishing the defense.  Fed. R. Civ .P. 8(c), *Goodman v. Praxair, Inc*.,

494 F.3d 458, 464 (4th Cir. 2007).  "Section 1983 provides a federal cause of action, but in several

respects relevant here, federal law looks to the law of the State in which the cause of action arose.

This is so for the length of the statute of limitations: it is that which the State provides for personal-

injury torts."  *Wallace v. Kato*, 549 U.S. 384, 387 (2007) (citing *Owens v. Okure*, 488 U.S. 235,

249-50 (1989)).  In Maryland, the applicable statute of limitations is three years from the date of

the occurrence.  *See* Md. Code Ann., Cts & Jud. Proc. Code § 5-101.

When a cause of action has accrued under § 1983 is a federal question.  *See Nassim v. Md.*

*House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc).  The date of accrual occurs "when

the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will

reveal his cause of action."  *Id*.  Under the prison mailbox rule, an action under § 1983 commences

for the purpose of meeting the statute of limitations when the complaint is delivered to prison staff

for mailing and is no longer under the plaintiff's dominion and control.  *See Houston v. Lack*, 487

U.S. 266, 276 (1988); *Lewis v. Richmond City Police Dept*., 947 F.2d 733 (4th Cir. 1991).

The three-year statute of limitations may be tolled for equitable reasons, but only in "those

rare instances where, due to circumstances external to the party's own conduct, it would be

unconscionable to enforce the limitation period against the party and gross injustice would result."

*Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc) (citing *Harris v. Hutcherson*, 209 F.3d

325, 330 (4th Cir. 2000)).  Equitable tolling is unavailable to a plaintiff who has not been diligent

in protecting their rights; rather, the plaintiff must establish that they have been prevented from

asserting those rights.  *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 555 (1974).  Under

Maryland law, the statute of limitations is strictly construed.  "Absent legislative creation of an

exception to the statute of limitations, we will not allow any 'implied and equitable exception to

be engrafted upon it.'"  *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 333 (1994) (quoting *Booth

Glass Co. v. Huntingfield Corp.*, 304 Md. 615, 623 (1985)).

Assuming that Stuckey gave the initial complaint to prison staff for mailing the same day

he signed it, this case was initiated on December 13, 2021.  ECF No. 1.  While Stuckey's earliest

allegations against the Wexford Defendants occurred more than three years prior to the initiation

of this case, the Court liberally construes the Amended Complaint as alleging his claims accrued

upon developing the alleged bone infection years later as a result of Defendants' failure to modify

his SNO or surgically treat his hip.  As such, the Court will proceed to the merits of his claims.

      b.  Deliberate Indifference

As the Wexford Defendants have submitted materials outside the pleadings, the Court will

construe their Motion as one for summary judgment.

The parties agree that Stuckey suffered from severe DJD in his right hip and mild DJD in

his left hip.  However, based on the record before the Court, none of the Wexford Defendants were

deliberately indifferent to Stuckey's condition.  Both NP Ledjo and NP Litell only saw Stuckey

on a single occasion and each of them, aware of his pain, provided him with reasonable treatment.

NP Ledjo renewed his medications and ordered x-rays to determine the cause of his pain.  Those

x-rays, which showed differing levels of DJD in each hip, were reviewed by NP Litell, who

provided Stuckey with hip exercises to supplement his prescribed medications.  Notably, Stuckey

told each of the Wexford Defendants that he wanted to wait to have surgery on his hip for as long

as possible based on the advice of outside medical providers.  As such, when Dr. Nimely saw

Stuckey, she maintained his medications and directed him to continue his exercises to preserve hip function.

Stuckey's allegations that the Wexford Defendants refused to modify his SNO are also unsupported by the record. There is no evidence that Stuckey had an existing SNO or that he requested that any of the Wexford Defendants issue one in light of his condition. Stuckey filed numerous sick calls, but none of them concern the need for a modified SNO. *See* ECF No. 29-4 at 75-167.[4]

Finally, nothing in the record demonstrates that Stuckey presented to any of the Wexford Defendants with symptoms of a bone infection. As such, none of them were subjectively aware of such a medical need. At best, it appears that Stuckey, in hindsight, disagrees with the Wexford Defendants' course of treatment because his DJD pain worsened over time. However, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)). Stuckey does not present any evidence of exceptional circumstances, nor is there evidence that the treatment he received exposed him to a serious or significant injury. Therefore, the Wexford Defendants are entitled to summary judgment in their favor.

### III.     Defendants Teferra, Kingoo, Hunter, and Memarsadeghi

Defendants Teferra, Kingoo, Hunter, and Memarsadeghi have also submitted materials outside the pleadings and thus the Court will construe their Motion as one for summary judgment as well. They assert they are entitled to summary judgment because the undisputed facts demonstrate that they were not deliberately indifferent to Stuckey's medical needs.

---

[4] Stuckey requested a medical assignment for a bottom bunk on May 6, 2017, which was provided on May 12, 2017. *Id.* at 6, 80. Stuckey does not assert whether this is the SNO to which he refers. Regardless, the record shows that it was provided upon request.

Again, while it is undisputed that Stuckey has severe DJD in his right hip and mild DJD in his left hip, the record does not show that Stuckey received inadequate medical care. Rather, each medical provider actively monitored Stuckey's condition and adjusted his treatment based on their individual evaluations. Dr. Memarsadeghi switched Stuckey's prescription from Naproxen to ibuprofen upon his request. Similarly, when Dr. Teferra observed Stuckey limping on his right side, she ordered him a mobility aid and submitted an orthopedic consult because Stuckey was ready to consider surgery. As Stuckey's discomfort increased and mobility decreased, both NP Kingoo and Dr. Hunter modified his medications to try to alleviate his pain. Additionally, they requested orthopedic consults when Stuckey reported that he wanted to be evaluated for surgery instead of waiting as he had previously indicated to his medical providers.[5] *See* ECF No. 26-7 at 73, 87; ECF No. 26-8 at 28.

Furthermore, in none of the records provided is there evidence that Stuckey had an SNO in place or that he requested that any of the providers issue or modify an SNO. Nor does the record show that Stuckey had any symptoms of a bone infection. Thus, as none of Dr. Memarsadeghi, Dr. Teferra, Dr. Hunter, or NP Kingoo's actions regarding Stuckey's care were "for the very purpose of causing harm or with knowledge that harm [would] result," *Farmer*, 511 U.S. at 835, they are entitled to summary judgment in their favor.

**IV. Chantal Tchoumba**

Chantal Tchoumba was not served and has not answered the Amended Complaint. However, Stuckey only alleges that she gave him "more pain killers" on August 18, 2019, and refused to modify his SNO. ECF No. 8 at 6. For the reasons previously discussed, this fails to status a claim and must be dismissed pursuant to 28 U.S.C. § 1915.

---

[5] The Court notes that in Stuckey's final motion for extension of time (ECF No. 47), he states he was sent to Johns Hopkins Bayview Hospital for hip surgery on November 1, 2022.

**Conclusion**

For the foregoing reasons, Defendant Jahed and the Wexford Defendants' Motions are GRANTED and the Corizon Defendants' Motion is GRANTED as to Defendants Teferra, Kingoo, Hunter, and Memarsadeghi and STAYED as to Corizon Health, Inc.  The Amended Complaint is DISMISSED as to Chantal Tchoumba pursuant to 28 U.S.C. § 1915.  A separate Order follows.


March 8, 2023_____
Date

                            /s/
                            Stephanie A. Gallagher
                            United States District Judge